So we've got five minutes aside for this argument. And so we'll begin with Mr. Losky. It takes four of you guys just to go against Mr. Gerber. That's to some extent. Anyway, floor is yours. Good morning, Your Honors. Obviously, given the short time, I'm most interested in answering the panel's questions. But I would like to just emphasize three points up front. First, everyone agrees that Instacart shoppers fall within the statute's definition of a motor carrier, which is the hook for preemption. Second, the compensation that shoppers receive for performing transportation services that bring them within the statute's coverage, is there price for doing so? And third, all of the evidence about the escalating disruptions to our business model and the associated harms to our shopper relationships and goodwill that will culminate with the changes on July 1st is actually undisputed. Let me start with the last point, irreparable harm. The district court took the city's statistics about how the restaurant delivery platforms fared under a similar regime as really the only relevant proof on this question. But that's not true. Below and in this court, we have submitted detailed declarations, which are uncontroverted, about how Instacart's unique business model works and, in particular, how flexibility is key to this business model. The Tandler Declaration that we submitted in this court at paragraphs 38 to 41 explains that what makes Instacart so appealing for shoppers is the flexibility that they enjoy in choosing where to work, when to work, and how to work. And this is important for people who've got caregiving responsibilities, for students, for people who have other jobs, for people who may have disabilities or physical limitations they need to work around. They can choose where they want to shop, how far they want to go for orders. They can set limitations on the weight of the physical items they want to collect. They can choose to go to retailers they're familiar with. All of these things are a key part of what makes Instacart's business model a success. And... How often do they use their vehicles? So the evidence is that 99% of shoppers in New York City use motor vehicles for their deliveries and 90% of the batches that are offered to shoppers in New York are offered only to shoppers who have full-size motor vehicles. And also, just as an intuitive matter, if you think about grocery shopping, typically it's going to be larger orders that are less practical to do with a bike or a moped anyway. And this, again, all of this is undisputed to the fact that the overwhelming majority of the people who are subject to this law use motor vehicles and therefore provide transportation. I understand when you say undisputed, that the argument with respect to irreparable harm is that this is speculative, that you don't really know. Sure, flexibility might be important to the shoppers, but under this new business model, how many are going to quit? How would you know how many are going to quit? That's exactly the problem, Your Honor. We don't know how many are going to quit. So that makes it speculative, doesn't it? I don't think it does, Your Honor. I think what we do know and what is not speculative and what the district court did not grapple with is that if the model has to change in compliance with Local Law 124 to compensate on call time and therefore to introduce restrictions on where, when, and how people can work, that the platform will no longer be attractive to a meaningful number of shoppers. I can't tell you exactly how many that's going to be, but that's because this is the classic kind of unquantifiable... You know your workforce, right? You know your workforce. You haven't sampled your workforce to produce for the courts some kind of meaningful... I mean, you're making an extrapolation, but you're basing it just upon the characterization of what the law will do to your business model, and you're asking us to accept the conclusion for which you offer no quantum of data. So I don't agree with that, Your Honor. The Tandler Declaration, both the one we filed in this Court and the one we filed below, refer to surveys that Instacart has done of shoppers along the lines that you're describing, that where they have said that if this flexibility were taken away, a meaningful number of them, I don't know that we have an exact percentage, but people would be more likely to stop doing Instacart and to go do something else for income. And that's not speculative. It is not quantifiable in the sense of, you know, I can tell you an exact percentage. That's pretty generalized, though. You could have just, piggybacking on Judge Wesley's question, done, picked 100 shoppers and said, these are the new, take your new business model that we can implement. These are going to be our new rules. How many of you are going to quit and maybe try to extrapolate out? So we have not done that, Your Honor. What I can tell you is... You told us the percentages of what will undo your business model, like anything greater than 12 percent or anything greater than 15 percent. I don't, I wish I had a specific number I could point you to. But you're asking the Court to invoke a very substantial equitable power, and that's to join the enforcement of a statute duly authorized by the City of New York. Why would we do it on just a business person's complaint about the fact that it's going to affect their business? So I don't... Because that then would make preliminary injunctions almost universal. So I don't agree with that characterization of our evidence, Your Honor. Ms. Tandler in her declarations is not describing what she thinks is going to happen. She is describing, one, the changes that compliance with the law will necessarily require, and two, based on those changes, what we understand from shoppers, what they have told us about what matters to them, what changes they will then make in response. It's not speculative to say that people who are drawn to this platform because it allows them to work flexibly around their other obligations will go do something else if they can no longer work flexibly around their other obligations. Certainly, I can't tell you exactly how many people are going to react that way, in part because... Potentially they're going to make more money, right? Potentially they're going to make more money. Potentially, yes, although... Doesn't have the point? Well, so certainly that's what the City would tell you, but I think that relies in part on a selective reading of the statistics from the restaurant delivery context. Their average compensation did go up, but that's because the pie shrunk, and quite a lot of people, therefore, ended up not actually working at all, which is precisely the concern that we have. And the issues for us are that much more acute because our business model is different. And if there's one thing I do want to underscore about the district court's analysis on this topic, it's that the restaurant delivery platforms already had the sort of one-to-one individual offer model that we are going to be forced to adopt. So the changes that they saw, I would say, are detrimental to their business, but they don't compare to the ones that we're going to experience because we're going to have to shift to a completely different business model. And I would say, Judge Wesley, this Court's cases in evaluating this kind of harm, harms to goodwill from sort of core changes to a business, have never required quantification, right? Ultimately, the irreparable harm inquiry is a practical one. It's about what's going to happen on the ground, and it is, I think, commonsensical that compliance with this law, the changes that it's undisputed will be required, will drive away some nontrivial number of our shoppers in a way that is unquantifiable and therefore irreparable. All right. Thank you very much. Thank you. We'll now hear from Ms. Trujillo. Good morning, Your Honors. May it please the Court. Alina Jerker on behalf of the city. I noticed that there was a reference earlier to all of these things that are undisputed. They're not undisputed. It's very much in dispute, I believe, that they are. Instacart is not a motor carrier. Instacart shoppers are not motor carriers. And this law doesn't affect prices. It's not a price regulation. The F4A is enacted to deregulate the trucking industry, the interstate trucking industry, to let it compete on fair grounds with airlines. This is not that kind of a law. And what this law does is it applies primarily, actually, to bike deliveries. But it is a law that has taken into the fold this one tech company, among many others, who provide, in the gig economy, transportation of some sort through either electronic bikes, through cars. We are not regulating the vehicle. We are not regulating transportation. It is a quintessential pay rate law. They are not, and I think this is really worth emphasizing, these are not the prices that the customer pays. So what Instacart's model does is it creates an algorithm that bids out what you would like to buy your eggs for and have them delivered to your  And then it bids out to shoppers the opportunity to provide that service. These are two different algorithms. And what the F4A cases focus on is the price the customer pays. The input that Instacart pays is not relevant to the, it is not a price. So, and also just, our time is so short, I want to talk about this second point about irreparable harm. This lawsuit is challenging a law. The law is the minimum pay law. This thing that is about to happen in July about the on-call rules, it's about DCWP's rulemaking. The rulemaking and how the minimum pay law is going to be applied. They never challenged that. They challenged the law. So it is a little bit confusing to me why we are even talking about the implementation of the law and the agency's regulations. Because what they are challenging and seeking an exemption from is an entire law and not how it applies to their business. If it would be helpful to pivot back, I think the other thing that is really important to emphasize is that the, I guess I want to say, the Supreme Court has repeatedly spoken about the F4A and how it should be  And I think there is a fundamental weakness in their case and why they can't prevail on the merits and why this Court shouldn't issue an injunction pending appeal and why they are unlikely to succeed on appeal, which is that the F4A is supposed to be interpreted according to its deregulatory purpose. Justice Scalia, actually several courts, in fact, as recently as last week in Montgomery v. Carbide, construing the F4A, have emphasized that this statute, the preemption would never run its course if you just read the text. That's why we don't believe motor carrier is anyone who transports anything, even on a one-off basis, for money. If I asked you, hey, when you're going to Home Depot, could you pick me up a leaf blower? I'll pay you $5. Are they suddenly, is that a relationship that is now regulated and deregulated by the federal government? It's not. And it's not because this expansive, very sort of purely textual reading of the F4A isn't what the Supreme Court has embraced. Instead, it's embraced one that the statute is read in accordance with its purposes. That is entirely consistent with our minimum payroll and why our minimum payroll should remain in effect pending this litigation and throughout the end of it. What's the status of the litigation itself right now in the district court? So I believe that there is the appeal pending on the denial of their motion for a preliminary injunction, and they filed their brief already and will be filing our responding brief in the middle of the summer. And below, I think that the parties have been discussing whether or not I think there's litigation relating whether to stay the appeal pending the P.I. determination to the extent there's purely legal questions, resolve it. But other than that, it should be proceeding to resolve whether or not there is preemption here, which there is not. And there are other claims which are equally not meritorious, which is Because I know in the DoorDash litigation, the city agreed to a stay with regard to the enforcement of the statute for a period of time. Yeah, yes. But you haven't reached those discussions yet. Is that it? They have not. We have not been. I'm not aware of any discussions. I mean, it's not substantively determined here, but I was just interested. Yeah, no. I don't believe it is. All right. All right. Well, thank you. We will reserve the decision. Thank you.